IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| STEPHANIE DIXON,<br><br>    Plaintiff,<br><br> vs.<br><br>STATE OF HAWAII, DEPARTMENT<br>OF EDUCATION,<br><br>    Defendant. | CV. NO. 16-00110 DKW-KJM<br><br>**ORDER GRANTING DEFENDANT<br>STATE OF HAWAII, DEPARTMENT<br>OF EDUCATION'S SECOND<br>MOTION FOR JUDGMENT ON THE<br>PLEADINGS** |

## <u>INTRODUCTION</u>

Following amendment of the complaint, the State of Hawaii, Department of Education ("DOE"), again seeks judgment on the pleadings as to Dixon's discrimination, retaliation, and hostile work environment claims under Title VII. Dixon alleges that the DOE treated her less favorably than a similarly situated white male employee when she was denied training opportunities, forced to share an office with another African American school counselor, and eventually moved to a smaller office. Dixon further alleges that the DOE took no action when she complained to her supervisors about the disparate treatment, and instead retaliated against her when she reported an assault by a parent of one of the students she counseled. Despite the Court's prior guidance, Dixon once more fails to adequately state claims for

discrimination, retaliation, and hostile work environment, and, as a result, the Court GRANTS the DOE's Motion without leave to amend.

## BACKGROUND

### I.    Factual Background

Dixon has been employed by the DOE from 1999 to the present.   In July 2006, she was assigned to Iroquois Point Elementary School ("IPES") to work as a school counselor and was the only African-American female counselor at the school during the relevant time period.   Second Am. Compl. ("SAC") ¶¶ 5–6, 11, Dkt. No. 56.

Dixon alleges that beginning in 2008, the DOE subjected her to "disparate and differential treatment as compared to similarly situated, non-African American employees," including a white male counselor.   SAC ¶ 12.   For example, in January 2008, Principal Heidi Armstrong, a Caucasian female, allegedly forced Dixon and the only African American School Based Behavioral Health Specialist ("SBBH") to share an office, even though the SBBH worked with students with substantial emotional needs.   SAC ¶¶ 7, 14.   Dixon alleges that she was unable to remain in the small, shared space when the SBBH conducted private meetings, and had to find another location to work or conduct her own meetings.   SAC ¶ 15. Although Dixon expressed her concerns to Armstrong about this shared-office arrangement, she contends that Armstrong required the two African American

females to share the same office until the SBBH left IPES in approximately June 2009. SAC ¶ 16.

In November 2009, Armstrong relocated Dixon's office from a portable classroom to a converted library storage closet, which was approximately one-fifth the size of her white male colleague's office in the library conference room. SAC ¶¶ 17–18. The white male counselor was able to conduct meetings in his own office space, but Dixon asserts that she had to leave her office to find another location to conduct her meetings, which interfered with her ability to perform her job. SAC ¶ 19. Because she was the only African American employee at IPES at that time, she claims to have been "humiliated on a daily basis [because she] was forced to sit in a converted closet space as her office." SAC ¶ 19.

Dixon also alleges that she was treated differently than, and denied opportunities afforded to, the Caucasian male school counselor with less seniority. From September 2009 to January 2012, Dixon was not allowed to attend training in connection with IPES's transition to becoming an International Baccalaureate school, even though her male colleague was allowed to do so once in 2009 and again in 2012. SAC ¶¶ 21, 23. When Dixon confronted Armstrong during an October 13, 2010 faculty meeting "about IB training in Los Angeles[,] Armstrong glared at [Dixon] and angrily told [her] that they would discuss it later." SAC ¶ 22.

In addition to performing her own duties as a school counselor, Dixon claims that she was also expected to provide assistance to other employees at IPES, whereas the white male counselor did not have the same additional expectations. SAC ¶ 24. Unspecified "assignments outside the scope of Plaintiff's job description occurred frequently until Plaintiff went on workers' compensation leave" in October 2012. SAC ¶ 24.

Dixon also claims that she was required to find her own substitute when she was absent, but her male counterpart was not. If he needed a substitute, Vice Principal Robert Hurley, also a Caucasian male, assisted the white male counselor in securing one. SAC ¶¶ 25–26. For example, Dixon alleges that, in October 2010, after finding a substitute for herself, the substitute notified her that Hurley contacted the substitute to fill-in for the white male counselor instead. According to Dixon, the substitute told her that Hurley informed the substitute that Dixon would have to find another substitute for herself. SAC ¶ 26.

Dixon maintains that "[o]n many occasions [she] attempted to address her concerns about the disparate treatment to which she had been subject but no changes were made." SAC ¶ 27. Instead, her concerns were often met with hostility by Armstrong and Hurley. SAC ¶ 27. Dixon's SAC includes a new allegation that Armstrong "made numerous racial comments to Plaintiff during 2009-2010, which made Plaintiff feel even more uncomfortable." SAC ¶ 20. The SAC, however,

provides only one example: "Armstrong commented about Plaintiff's hair style in relation to her being African American. Armstrong exclaimed, 'You people change your hair styles every week!'" SAC ¶ 20. And on an unspecified date before August 2012, Dixon alleges that Hurley "made racist remarks to Plaintiff about being African American. Hurley asked Plaintiff something to the effect of whether she played basketball or was a good athlete in reference to her being African American." SAC ¶ 34.

In August 2012, Dixon alleges she was verbally and physically assaulted by a parent of a student to whom she had been assigned. SAC ¶ 29. Dixon reported the assault to Principal Ofelia Reed, a Filipino American female who had replaced Armstrong earlier that month.[1] Dixon claims no action was taken following her report. SAC ¶¶ 9, 23. In fact, although Dixon requested more than once that the Caucasian male counselor be assigned to work with this student, Principal Reed refused and, instead, "expected Plaintiff to continue working with the student and the parent who assaulted Plaintiff." SAC ¶ 31–32. According to Dixon, Reed told her on October 10, 2012 that the other counselor would not be reassigned because her white male counterpart "does not do well with change." SAC ¶ 33. Dixon alleges that although another teacher notified Reed and Hurley on August 8, 2012

---

[1]Dixon alleges that because Armstrong had been promoted to Complex Area Superintendent, she still had supervisory authority over IPES. SAC ¶ 10.

about the parent's "aggressive behavior," Dixon was still required to work with the parent "and the White/Caucasian male counselor was not required to do so." SAC ¶ 36. She claims that when attempting "to discuss her fear of physical harm inflicted by the parent with Hurley, he told [Dixon], 'What's the matter Steph, you sound scared? What's the matter? You sound nervous. You can take her (referring to fighting the parent).'" SAC ¶ 34.

Dixon went on stress leave beginning October 12, 2012 "due to the harassment and discrimination to which Defendant had subjected her." SAC ¶ 34. She remains in that status to this day.

## II.    Procedural Background

On March 11, 2016, Dixon filed the current action against the DOE pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.* Compl., Dkt. No. 1. On June 7, 2016, she filed her First Amended Complaint ("FAC") asserting two Counts for "Illegal Employment Discrimination" and "Retaliation" in violation of both Title VII and Hawaii Revised Statutes ("HRS") Chapters 368 and 378. Dkt. No. 8. Count I alleged discrimination based on Dixon's race, color and sex, alleging that the DOE "treated Plaintiff differently as compared to similarly situated employees who were not of the same race, color, or sex," FAC ¶ 31, and that the conduct of "Defendant's supervisory and administrative employees against Plaintiff created a hostile and offensive working environment." FAC ¶ 32. Count II asserted that the DOE

retaliated against Dixon for bringing complaints of "harassment and discrimination which were violations of State and Federal law," FAC ¶ 38, and that such "retaliation by Defendant reflects a pattern and practice of illegal behavior." FAC ¶ 39.

In a December 5, 2017 Order, the Court granted the DOE's first motion for judgment on the pleadings, dismissing the FAC, and granting Dixon limited leave to file an amended complaint only as to her timely Title VII claims. 12/5/17 Order, Dkt. No. 54. Her disparate treatment (Count I), retaliation (Count II), and hostile work environment claim based on either discrimination or retaliation were dismissed with leave to amend to attempt to cure the specific deficiencies noted in the 12/5/17 Order. 12/5/17 Order at 16. The Court explained that Dixon's disparate treatment and retaliation claims were based upon discrete acts—each of which constitutes a separate actionable unlawful employment practice that Dixon was required to timely assert in her EEOC Charge—and that claims for discrimination and retaliation based on discrete acts occurring outside of the 300-day statutory filing window were untimely. *See* 12/5/17 Order at 10–15. The Court dismissed *with prejudice* as time-barred any claims based on discrete acts that accrued before March 19, 2012—300 days prior to the filing of Dixon's EEOC Charge on January 13, 2013. 12/5/17 Order at 16.

Dixon's SAC added additional factual allegations in an attempt to resurrect her claims for disparate treatment (Count I), retaliation (Count II), and hostile work environment based upon either discrimination or retaliation.   The SAC also appears to attempt to reassert claims based upon untimely discrete acts, previously dismissed with prejudice, by contending that they are not actually "discrete acts."   The DOE again moves for judgment on the pleadings and requests the dismissal of each of Dixon's claims with prejudice.

## STANDARD OF REVIEW

The standard governing a Rule 12(c) motion for judgment on the pleadings is functionally identical to that governing a Rule 12(b)(6) motion.   *United States ex rel. Caffaso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). A plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008).   This tenet—that the court must accept as true all of the allegations contained in the complaint—"is inapplicable to legal conclusions."   *Iqbal*, 556 U.S. at 678.   Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a

complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.").

For a Rule 12(c) motion, the allegations of the nonmoving party are accepted as true, while the allegations of the moving party that have been denied are assumed to be false. *See Hal Roach Studios v. Richard Feiner & Co*., 896 F.2d 1542, 1550 (9th Cir. 1989). A court evaluating a Rule 12(c) motion must construe factual allegations in a complaint in the light most favorable to the nonmoving party. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). Under Rule 12(c), "[j]udgment on the pleadings is properly granted when, accepting all factual allegations as true, there is no material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Fleming*, 581 F.3d at 925); *see also Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist*., 644 F.3d 934, 937 n.1 (9th Cir. 2011). As detailed below, the DOE has met this standard.

## DISCUSSION

Despite the Court's prior guidance, Dixon again fails to adequately state claims upon which relief may be granted and her timely discrimination, retaliation, and hostile work environment claims are again dismissed. Much of the alleged conduct that forms the basis of Dixon's claims is comprised of discrete acts

occurring more than 300 days before she filed her Charge of Discrimination. The Court previously dismissed with prejudice claims based on these acts as untimely. To the extent Dixon strings together these discrete acts in an attempt to state a hostile work environment claim, the SAC nevertheless falls short of alleging conduct that is sufficiently severe and pervasive to alter the conditions of employment. Because Dixon once more fails to state plausible claims for relief, and because the Court determines that further leave to amend would be futile, the Court GRANTS the DOE's Motion.

## I. The Untimely Claims Are Dismissed With Prejudice

The Court previously dismissed with prejudice as untimely all claims based on discrete acts of discrimination and retaliation occurring prior to March 19, 2012—*i.e.*, those beyond 300 days of Dixon's January 13, 2013 EEOC Charge of Discrimination. *See* 12/5/17 Order at 10–17. Despite the Court's clear ruling, the SAC re-alleges the same pre-March 19, 2012 acts, and alleges new discrete acts also occurring outside of the 300-day window, in an apparent attempt to demonstrate continuing conduct sufficient to state a hostile work environment claim. Dixon's pleading efforts, however, fall short, and the Court again dismisses her untimely claims based upon discrete acts that accrued more than 300 days prior to the filing of her EEOC Charge on January 13, 2013. Because amendment with respect to the time-barred discrete acts would be futile, dismissal of these claims is with prejudice.

A. **Legal Principles Regarding Timeliness**

Title VII requires that a "charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); *see also EEOC v. Global Horizons, Inc.*, 904 F. Supp. 2d 1074, 1090 n.2 (D. Haw. 2012) ("The 300-day limitations period is applicable in this case because Title VII extends the 180-day period to 300 days if filed in a 'worksharing' jurisdiction. . . . Hawaii and California are both 'worksharing' states . . . ") (citations omitted).

The Court previously explained that:

> In determining whether a claim is timely, courts look to whether it is based on a discrete act of discrimination or retaliation. A discrete act consists of an unlawful practice that "occurred" on the day it "happened," which includes, for example, "termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111, 114 (2002). *Morgan* explains that a plaintiff may assert a claim for a discrete act only if the plaintiff timely filed an EEOC charge for that particular act:
>
> > [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [relevant statutory] time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely

11

filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id*. at 113.

By contrast, a hostile work environment claim is "different in kind" because it is "based on the cumulative effect of individual acts," "occur[ring] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id*. (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). Because hostile work environment claims develop over time, and are not based on acts that happen on a particular day as with claims based on discrete acts, the events making up hostile work environment claims are not limited to those within the limitations filing period. *Id*. at 113–14.

12/5/17 Order at 8–10. *Morgan* thus teaches that causes of action that can be brought individually expire with the applicable limitations period. By contrast, the hostile work environment theory is designed explicitly to address situations in which the claim is based on the cumulative effect of multiple acts, rather than on any particular action taken by the defendant. In such cases, the filing clock does not begin running with the first act because at that point the plaintiff has no claim; nor can a claim expire until the full course of conduct is complete. *See O'Connor v. City of Newark*, 440 F.3d 125, 128–29 (3d Cir. 2006) (citing *Morgan*, 536 U.S. at 117–18). The Court also noted previously:

Although Dixon argues that the claims against the DOE constitute a pattern or practice and were "policy decisions," these

12

alleged violations are not a series of acts that together amount to
a single pattern or practice.[2]

12/5/17 Order at 12–13 (footnote omitted).

**B.    Claims Based Upon Discrete Acts Occurring Before March 19, 2012 Are Time-Barred**

The discrete acts, previously dismissed as untimely, relating to Dixon's office

space assignments, denials of training, and substitute teacher requirements, remain

discrete acts.   Dixon's claims based on these discrete acts were untimely when the

Court dismissed them with prejudice in December 2017, and Plaintiff's persistence

in re-asserting them in the SAC changes nothing.

---

[2]As before, the Court once more does not construe Plaintiff's allegations as asserting a "pattern and practice claim" under Title VII.   For one, as discussed herein, Dixon's SAC—like the FAC—plainly describes each incident as a separate incident of discrimination or retaliation. Second, she has not alleged that any other employees were discriminated or retaliated against, and has not provided any anecdotal or statistical evidence indicating a pattern or practice of discrimination based on race and/or sex.   *See Obrey v. Johnson*, 400 F.3d 691, 694, 698 (9th Cir. 2005); *Wood v. Univ. Physicians Healthcare*, 2014 WL 3721207, at *6 (D. Ariz. July 28, 2014), *aff'd*, 657 F. App'x 643 (9th Cir. 2016) ("While Plaintiff uses 'pattern of discrimination' as a conclusory label, 'discrete discriminatory acts will not create a pattern of discrimination without more; pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on 'discriminatory conduct that is widespread.'") (quoting *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 701 (9th Cir. 2009)).   Finally, the Court observes that most pattern or practice claims are brought either by the EEOC or, if private, as class actions—indeed, certain other circuits have explicitly rejected pattern or practice claims brought by individual private litigants.   *See, e.g.*, *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004) ("We therefore hold that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs."); *see also Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 632 (10th Cir. 2012) (citing cases); *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 967 n.24 (11th Cir. 2008); *Celestine v. Petroleos de Venez. SA*, 266 F.3d 343, 355–56 (5th Cir. 2001); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760–62 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866–67 n.6 (7th Cir. 1985).   As such, the Court will not construe Plaintiff's reference to "pattern and practice" as evincing an actual claim under that scheme.

The SAC, for instance, again alleges that in January 2008, Armstrong forced Dixon and another African American female to share the same office. That office-sharing arrangement continued until approximately June 2009. SAC ¶¶ 14–16. Dixon asserts that this arrangement was "not a discrete act of discrimination. Rather, the office sharing arrangement interfered with Plaintiff's ability to perform her job duties *on a daily basis*." SAC ¶ 15 (emphasis added). Likewise, in November 2009, Armstrong relocated Dixon's office from a portable classroom to a converted library storage closet, "which interfered with [Dixon's] ability to perform her job duties on a daily basis." SAC ¶¶ 17–19. As the Court previously explained, however, these office assignments represent discrete acts, regardless of whether Dixon may have continued to feel the effects of the assignments "on a daily basis." In its prior Order, the Court held:

> Specifically, Dixon's allegations that she was assigned to share an office, beginning in January 2008, and then moved out of this office into a converted closet in November 2009—are discrete acts—these events are actionable in and of themselves at the time of the occurrence. She argues, erroneously, that her shared-office space was "an indefinite assignment with which Plaintiff had to deal every single day and which interfered with her ability to do her job as a School Counselor working in the same space as the SBBH who dealt with severely disturbed children." Mem. in Opp'n at 8. Likewise, she claims that her converted office space "assignment was not for one day or one week; it was a permanent assignment[.]" Mem. in Opp'n at 8-9. Dixon's argument misses the mark. Although she may have continued to feel the impact or the effects of the office assignment each day of her employment, a discrimination claim

does not accrue when the plaintiff feels the full effects of the discrimination, but when the discrete act occurs. *See Green v. Brennan*, 136 S. Ct. 1769, 1780 (2016) (confirming, in the employment law context, "the standard rule that a limitations period begins to run after a claim accrues, not after an inevitable consequence of that claim"); *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) (Although "the *effect* of the employer's rejection [of an employee's proposed accommodation] continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that *Morgan* offered as examples of a discrete act.") (citation and quotation omitted). The DOE's decisions to assign Dixon to the designated office spaces were each discrete acts giving rise to a separate cause of action.[3]

12/5/17 Order at 14–15. Nothing in the SAC or Dixon's opposition to the DOE's

Motion alters the Court's prior conclusion.

The SAC includes several new instances in which Dixon claims that she was

required to find her own substitute when she was absent, but her male counterpart

---

[3] *See, e.g., Vives v. Children's Hosp., Inc.*, 2013 WL 5607215, at *3 (E.D. La. Oct. 14, 2013) (granting summary judgment to employer where employee "received the space in 2006 and knew of [co-worker's] apparently larger space at that time," but she "filled out her EEOC intake questionnaire and charge on November 30, 2009, meaning that only claims relating [to] discrete acts which occurred on or after February 3, 2009, are timely brought," and plaintiff's "claim of discriminatory office space assignment is therefore time barred"); *Block v. Solis*, 2010 WL 2079688, at *11 (W.D. Wash. May 20, 2010) *aff'd*, 436 Fed. Appx. 777 (9th Cir. 2011) ("Ms. Block's transfer to the fifth floor and the DOL's denial of her request for accommodation constitute discrete acts that must be separately exhausted."); *Bernstein v. City of Atlantic City*, 2011 WL 2559369, at *5 (D.N.J. June 27, 2011) (finding that "removal of [plaintiff's] privileges regarding the city vehicle and removal from her office to a cubicle[] are discrete acts"); *Sgro v. Bloomberg L.P.*, 2008 WL 918491, at *5–*6 (D.N.J. Mar. 31, 2008), *aff'd in part, rev'd in part*, 331 Fed. Appx. 932 (3rd Cir. 2009) (noting that an office move to an undesirable location is a discrete act and not subject to the continuing violation doctrine); *Fol v. City of New York*, 2003 WL 21556938, at *4 (S.D.N.Y. Jul. 9, 2003) (determining that rejection of an employee's request for a more ergonomic work station is a discrete act).

was not required to do the same.   Dixon "was required to get a substitute on October 21, 22, 25, and 26, 2010.   The White/Caucasian male counselor was absent on October 28, 2010, April 5, 2012, and April 12, 2012, and no substitute was required."   SAC ¶ 26.   Moreover, Dixon alleges that, in October 2010, after finding a substitute for herself, the substitute notified her that Hurley contacted the substitute to fill-in for the white male counselor instead of Dixon.   According to Dixon, the substitute told her that Hurley informed the substitute that Dixon could find another substitute for herself.   SAC ¶ 26.   The Court has already determined that "[e]ach of these events 'constitutes a separate actionable unlawful employment practice' such that Dixon was required to assert them in a timely EEOC Charge." 12/5/17 Order at 16 (citing *Morgan*, 536 U.S. at 114).

Finally, with respect to her claim that she was denied training opportunities, these claims likewise remain discrete acts that are time-barred, despite the addition of new factual details.   Dixon now alleges that:

> In early 2009, Plaintiff was not selected to attend an IB training in New Jersey.   On September 11, 2009, Plaintiff was informed that she was selected to attend an IB training.   On September 14, 2009, Plaintiff was then informed that she was not selected to attend the training, despite Plaintiff's job duties related to IB training and despite the fact that she had more seniority than other faculty members who were allowed to attend the training. In fact, some members were offered the opportunity to attend other training sessions if they could not attend the one for which they were selected.   However, Plaintiff was not offered those opportunities either.

SAC ¶ 21.   The white male counselor was allowed to attend training on unspecified

dates in 2009 and 2012.   SAC ¶ 22.   Dixon argues "[t]his was not a discrete act.

Rather, Plaintiff's inability to attend the same training as the other faculty members

interfered with Plaintiff's ability to do her job."   SAC ¶ 21.   Again, the Court

disagrees for the same reasons previously given:

> Similarly, Dixon's claims that she was denied training
> opportunities afforded to [her white male colleague] in 2009 and
> 2012 are discrete acts, each separately actionable, despite the
> fact that she may have felt the continued effects of the denials
> indefinitely.   Once again, a discrimination claim does not
> accrue each time a plaintiff feels the effects of the
> discrimination, but when the underlying discriminatory act
> occurs.   *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620,
> 634 (10th Cir. 2012) (noting that a claim accrues upon the
> occurrence of the act and rejecting similar denial-of-training
> claim as untimely); *Lewis v. City of Chicago*, 560 U.S. 205
> (2010) (affirming the general rule that the present effects of past
> actions cannot lead to Title VII liability for claims requiring
> discriminatory *intent*, including disparate treatment claims).
> Indeed, one of the claims *Morgan* labeled a discrete act was just
> such a denial-of-training claim.   *See* 536 U.S. at 114–15; *see
> also Lyons v. England*, 307 F.3d 1092, 1107 n.8 (9th Cir. 2002)
> (listing an employer's failure-to-train as a discrete act); *Phan v.
> Employment Dev. Dep't*, 2017 WL 3116826, at *4 (E.D. Cal.
> July 21, 2017) (dismissing as untimely claim that defendant's
> failure to train and certify was an ongoing violation, where
> plaintiff was the only employee who lacked foreign language
> certification, which meant she received less pay, holding that
> plaintiff "cannot merely repackage a discrete act as ongoing to
> circumvent the Supreme Court's teaching in *Morgan*").   Thus, it
> is irrelevant that Dixon did not experience the full effects of her
> denials of International Baccalaureate implementation training
> until sometime later or even that she continues to feel the effects

to the present. Dixon was required to file an EEOC Charge within 300 days of each denial of training.

12/5/17 Order at 15–16.

In short, any claims based on discrete acts that accrued before March 19, 2012—300 days prior to the filing of Dixon's Charge on January 13, 2013—are time-barred. They were barred at the time of the Court's December 2017 Order, and they remain so today. Because further amendment with respect to the time-barred discrete acts would be futile, dismissal of these claims is with prejudice. Defendant's Motion is therefore granted to the extent it seeks dismissal of the untimely claims based on discrete acts occurring outside of the 300-day window.

## II.    The SAC Fails to State a Plausible Hostile Work Environment Claim

The Court granted Dixon leave to amend her hostile work environment claim, explaining that the factual allegations in the FAC did not demonstrate "the severity, pervasiveness or abuse required to sustain a hostile work environment claim." 12/5/17 Order at 27. Despite the addition of new allegations in the SAC, Dixon's hostile work environment claim, whether based upon discrimination or retaliation, falls short yet again.

### A.    Legal Standard for Hostile Work Environment Claims

A hostile work environment is one that is permeated with discriminatory intimidation, ridicule, and insult that is "sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment."

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)).   "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he [or she] was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment."   *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004).

In considering whether the discriminatory conduct was "severe or pervasive" for purposes of Title VII, the Court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).   The Supreme Court has cautioned that "Title VII [is] not . . . a general civility code," and therefore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."   *Faragher*, 524 U.S. at 788 (citations and quotations omitted).

Assuming the truth of the allegations in the SAC, and examining all the circumstances—including the infrequency of the allegedly discriminatory conduct in 2008, 2009, 2010 and 2012; the lack of severity; the absence of physically threatening conduct on the part of DOE officials; and the lack of any facts demonstrating that the DOE's actions *unreasonably* interfered with Dixon's work performance, *see Kortan*, 217 F.3d at 1110—it remains clear that the alleged conduct was neither severe nor pervasive and did not create an abusive work environment.

### B.    Dixon Fails to State a Hostile Work Environment Claim

The FAC lacked any overt reference to sex, color, or race, contributing to the Court's decision to dismiss it.   In an apparent effort to remedy this, the SAC includes a new allegation that Armstrong "made numerous racial comments to Plaintiff during 2009-2010, which made Plaintiff feel even more uncomfortable." SAC ¶ 20.   Only a single example, however, is provided.   On an unspecified date, "Armstrong commented about Plaintiff's hair style in relation to her being African American.   Armstrong exclaimed, 'You people change your hair styles every week!'"   SAC ¶ 20.   Additionally, again on an unspecified date but sometime before August 2012, Dixon alleges that Hurley "made racist remarks to Plaintiff about being African American.   Hurley asked Plaintiff something to the effect of whether she played basketball or was a good athlete in reference to her being African

American." SAC ¶ 34. Although neither of these statements—made by different supervisors, at what appear to be dates up to two or three years apart—explicitly target or denigrate Dixon due to her race, the Court draws all inferences in her favor, and assumes for purposes of this Motion that the isolated statements included an element of racial animus, as she represents. Courts have found that similar, and more egregious comments, were not actionable.[4] *See, e.g., Magee v. Securitas Sec.*

---

[4]*See, e.g., Magee v. Securitas Sec. Servs. USA, Inc*., No. 3:15CV333TSL-RHW, 2016 WL 4470762, at *7 n.4 (S.D. Miss. Aug. 23, 2016) (citing cases); *Venton v. Million Dollar Round Table*, No. 13-CV-7725, 2015 WL 3777543, at *4 (N.D. Ill. June 16, 2015) (noting that, while comments relating to the plaintiff's hair, including: "what do black people use in their hair," "is your hair kinky," "what is the grade of your hair," and "do black people need to wash their hair every week," arguably had a racial component, "without the traditional hallmarks of impermissible racial harassment such as slurs, epithets, or overt racial animus or intimidation [they] do not necessarily amount to discrimination."); *Stepp v. Rexnord Indus., Inc*., No. 1:13-CV-00683–TWP, 2014 WL 6978329, at *7 (S.D. Ind. Dec. 9, 2014) (assuming comment, "I just couldn't get past the hair," referred to the plaintiff's dreadlocks, "this singular comment about an unidentified hairstyle does not support an inference that Rexnord discriminated against Mr. Stepp based on his race when it did not offer him employment"); *Perches v. Elcom, Inc*., 500 F. Supp. 2d 684, 692 (W.D. Tex. 2007) (occasional comments about the plaintiff's hair and lips, including asking whether her hair was real, though offensive utterances, were not sufficiently severe or pervasive to establish a hostile work environment); *Eatman v. United Parcel Serv*., 194 F. Supp. 2d 256, 264-65 (S.D.N.Y. 2002) (finding that managers' alleged comments to black employee with dreadlocks that he "looked like an alien and like Stevie Wonder," comparing his hair to "shit," equating his hair with "extracurricular" drug use, requesting a pair of scissors (as if to cut off the locks), and pulling his hair, "while hurtful, sophomoric and insulting, [were] not racist in nature and [did] not support a reasonable inference of racial discrimination" and further finding that "[l]ocked hair . . . is not so closely associated with black people that a racially neutral comment denigrating it can reasonably be understood as a reflection of discriminatory animus, at least where there is no objective evidence that the speaker perceived the plaintiff's locked hair as related to his race"); *but cf. Fennell v. Marion Indep. Sch. Dist*., 804 F.3d 398, 415 (5th Cir. 2015) (viewed in light most favorable to the plaintiff, defendant's comment to the plaintiff that he "know[s] how much you people spend on your ethnic hair styles" was "clearly indicative of racial animus" in context of equal protection challenge); *Woods v. FacilitySource LLC*, No. 2:13-CV-621, 2015 WL 247980, at *17 (S.D. Ohio Jan. 20, 2015), aff'd, 640 Fed.Appx. 478 (6th

*Servs. USA, Inc*., No. 3:15CV333TSL-RHW, 2016 WL 4470762, at \*7 (S.D. Miss. Aug. 23, 2016) (finding "not severe enough to support a hostile work environment claim," remarks "to the effect of 'I don't know why they wear their hair like that. Don't they realize that's ugly?'"); *Alexander v. U.S. Dep't of Veterans Affairs*, No. CIV.A. DKC 10–3168, 2012 WL 78874, at \*5 (D. Md. Jan. 10, 2012) (without evidence of racial epithets, hostile work environment claim failed; "mere speculation as to racial . . . animus will not suffice to prove that [plaintiff] suffered unwelcome conduct due to race"). "Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII." *McGinest v. GTE Service Corp*., 360 F.3d 1103, 1113 (9th Cir. 2004). Even drawing all inferences in her favor and assuming that these two isolated comments by Armstrong and Hurley could reasonably be interpreted as racially offensive, they are neither severe nor pervasive enough to support a hostile work environment claim under the circumstances presented. *See Harris*, 510 U.S. at 21 (the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee[]' does not sufficiently affect the conditions of employment to implicate Title VII") (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634 (9th Cir. 2003) (no racially hostile work environment

___

Cir. 2016) (among other comments, statement that plaintiff had "nappy" hair, could be found to be based on race).

claim where the supervisor made only two derogatory comments about the plaintiff in a six-month period).

Dixon provides two other examples of isolated instances in which Armstrong allegedly treated her in a hostile manner. First, Dixon alleges that when she confronted Armstrong during an October 13, 2010 faculty meeting "about IB training in Los Angeles[,] Armstrong glared at [Dixon] and angrily told [her] that they would discuss it later." SAC ¶ 22. Second, she alleges that, on April 4, 2012, Armstrong called her "over the PA system, and, when Plaintiff met Armstrong in the school walkway, Armstrong yelled at Plaintiff in a hostile manner in front of parents and faculty." These encounters, two years apart, involved glaring and an angry tone of voice. Even in the context of the full record, they describe nothing more than encounters that are ubiquitous in the American workplace and come nowhere close to establishing a hostile environment under Title VII. *See George v. Leavitt*, 407 F.3d 405, 408, 416 (D.C. Cir. 2005) (claim that coworkers "shouted" at plaintiff on multiple occasions and told her to "shut up" insufficient to state a claim); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54 (D.D.C. 2004) (claim that supervisor told plaintiff "to shut up and sit down" and "scream[ed]" at her insufficient to state a claim); *Davis v. Team Elec. Co*., 520 F.3d 1080, 1090 (9th Cir. 2008) ("characteriz[ing] behavior as mere ostracism when a supervisor 'stared at [the Plaintiff] in an angry way and allowed [her] co-workers to be mean to her,'

*Manatt v. Bank of America, NA*, 339 F.3d 792, 803 (9th Cir.2003), and when "males in the office refused to speak to [the Plaintiff] about anything other than work[,]' *Brooks v. City of San Mateo*, 229 F.3d 917, 928-29 (9th Cir. 2000)"); *cf. Medina v. Donahoe*, 854 F. Supp. 2d 733, 750 (N.D. Cal. 2012) (holding that where there was record evidence that plaintiff's coworker "glared at her threateningly; called her a 'bitch'; and attempted to batter her with a forklift while saying 'I want you sexually" and mouthing "I want to F you"[,] the 'alleged verbal and physical conduct was of an unwelcome sexual nature and, when taken together as a whole, it was sufficiently severe *and* pervasive to create an abusive work environment.'") (quoting *Porter v. Cal. Dep't of Corrections*, 419 F.3d 885, 895 (9th Cir. 2005)).

Dixon alleges that "unfair, illegitimate assignment of duties contributed to a hostile working environment," because she was "expected to provide assistance to others at IPES," which "forced [her] to take additional time to complete her own assigned tasks." SAC ¶ 24. Although Dixon concludes that these unspecified additional duties were outside of her job description, she does not explain who gave her these assignments or how they were so severe or pervasive that they unreasonably interfered with her ability to do her job. Without much more, assisting co-workers, even when required to do so, hardly characterizes a workplace that is abusive or intolerable.

Moreover, even assuming the discrete acts described by Dixon relating to office placement, training opportunities, substitutes, and work assignments could form the basis of a hostile work environment claim, her claim would still be deficient.[5]   For example, her allegations relating to office assignments and denial of training opportunities do not add up to a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of [her] employment and create an abusive working environment." *Morgan*, 536 U.S. at 115–16 (internal quotation marks omitted).   Although she alleges that she "was humiliated on a daily basis, as she and the only other African American employee at IPES were forced to work out of the same office for no legitimate reason," SAC ¶ 15, Dixon does not explain how these office assignments amount to conduct that was *objectively* severe or pervasive, or even how such assignments created an abusive working environment.

---

[5]"*Porter* [*v. California Department of Corrections*, 419 F.3d 885 (9th Cir. 2005),] teaches that Plaintiff's allegations of discrete acts are separate from the allegations of non-discrete acts making up his hostile work environment claim, and that merely asserting otherwise untimely discrete acts as part of a hostile work environment claim does not make them timely."   *Yonemoto v. Shinseki*, 3 F. Supp. 3d 827, 845 (D. Haw. 2014); *see also Rekow v. Sebelius*, 2011 WL 1791272, at *3 (D. Ariz. May 11, 2011) (collecting various cases standing for the proposition that "[b]ecause the Supreme Court has explicitly differentiated between discrete employment acts and a hostile work environment, many courts have concluded that a discrete act cannot be part of a hostile work environment claim and instead constitutes a separate unlawful employment practice") (quotations omitted); *Montoya v. Regents of Univ. of Cal.*, 2010 WL 2731767, at *7 (S.D. Cal. July 9, 2010) (describing that under *Porter*, "the only way to state a hostile environment claim under current Ninth Circuit law is to allege a timely non-discrete act").   Accordingly, whether Dixon may even attempt to support her hostile work environment claims with these discrete acts is questionable.

When, in August 2012, Dixon was verbally and physically assaulted by a parent of a student to whom she had been assigned, Dixon reported the assault to Reed, but no action was taken. SAC ¶¶ 29–30. When attempting "to discuss her fear of physical harm inflicted by the parent with Hurley, he told [Dixon], 'What's the matter Steph, you sound scared? What's the matter? You sound nervous. You can take her (referring to fighting the parent).'" SAC ¶ 34. Hurley's statement, although unprofessional and perhaps even juvenile, was not racially-based and does not rise to an actionable level of severity or objective unreasonableness. Dixon also alleges that, "on more than one occasion," and "documented on at least August 20, 2012 and October 10, 2012," Dixon requested that the white male counselor be assigned to work with this student, but Reed refused the reassignment and, instead, "expected Plaintiff to continue working with the student and the parent who assaulted Plaintiff." SAC ¶ 31–32. Although the assault described by Dixon at the hands of a parent might well have been a traumatic and unwelcome event, the DOE's alleged response to her report and request to reassign the student, without more, does not amount to the type of "severe and pervasive" conduct required to plausibly allege a hostile work environment claim. *See Brooks v. City of San Mateo*, 229 F.3d 917, 924 n.4 (9th Cir. 2000) ("A case involving a *single incident* of sexual harassment is obviously distinct from one involving a *series of incidents*, which the employer knows about and does nothing to

correct. In such circumstances, the non-action by the employer can fairly be characterized as acquiescence, *i.e.*, having changed the terms and conditions of employment to include putting up with harassment from other employees.") (emphasis added) (citation omitted); *Ellison v. Brady*, 924 F.2d 872, 877(9th Cir. 1991) ("In determining whether there was a hostile work environment, it is the conduct of the harasser that must be severe and pervasive.").

Viewing the totality of the circumstances alleged in the light most favorable to Dixon, she has not demonstrated the severity, pervasiveness, or persistent level of abuse necessary to sustain a hostile work environment claim. As noted previously, simply "[c]obbling together a number of distinct, disparate acts will not create a hostile work environment, because '[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim." *Grosdidier v. Chairman, Broadcasting Bd. of Governors*, 774 F. Supp. 2d 76, 110 (D.D.C. 2011) (alterations in original) (quoting *Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (D.D.C. 2009)).

Even accepting all factual allegations as true, because the SAC does not allege conduct by the DOE that was sufficiently severe or pervasive to alter the conditions of Dixon's employment, Dixon once more fails to state a Title VII hostile work environment, and the Court grants the DOE's Motion.

## III.    The SAC Fails to State a Plausible Disparate Treatment Claim

With respect to Dixon's timely discrimination claims, the DOE argues that the SAC remains deficient.   For instance, because Dixon neither suffered an adverse employment action nor alleged that any similarly situated employee outside of her protected class was treated more favorably, the DOE asserts that her disparate treatment claim fails as a matter of law.   The Court agrees.

Because Dixon offers little direct evidence of discrimination during the relevant time, the Court again focuses its inquiry on the elements of a prima facie case: (1) that Dixon belongs to a class of protected persons; (2) that she was qualified for her position and performed her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that the DOE treated her differently than a similarly situated employee who does not belong to the same protected class.   *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (*McDonnell Douglas* framework applies to Title VII claims).[6]   As the DOE points to the third and fourth elements as missing from Dixon's disparate treatment claim, the Court addresses each in turn.[7]

---

[6]The Court may look to these elements to determine whether Plaintiff has asserted a plausible claim for relief as required by *Iqbal* and *Twombly,* even though "a plaintiff need not plead facts constitut[ing] all elements of a prima facie employment discrimination case in order to survive a motion to dismiss."   *Fresquez v. Cty. of Stanislaus*, 2014 WL 1922560, at *2 (E.D. Cal. May 14, 2014); *see also Klingman v. Cty. of Maui*, 2016 WL 6996986, at *4 (D. Haw. Nov. 29, 2016) (noting that, on a Rule 12(b)(6) motion to dismiss, a plaintiff need not establish a prima facie Title

First, Dixon again fails to allege that she suffered an adverse employment action.  An adverse employment action in the context of a Title VII disparate treatment claim "is one that materially affects the compensation, terms, conditions, or privileges of . . . employment."  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and brackets omitted).  Dixon's timely allegations that Reed (1) took no action when Dixon reported the August 2012 assault by a parent, despite prior knowledge of the parent's alleged potential for violence; and (2) would not reassign another counselor to work with the student whose parent assaulted Dixon, despite at least two such requests from Dixon, SAC ¶¶ 29–33, 36, do not provide a sufficient basis for this Court to infer that Dixon was subject to an adverse employment action.  No allegations in the SAC suggest that the DOE's actions caused "a material employment disadvantage, such as a tangible change in duties, working conditions or pay."  *Delacruz v. Tripler Army Med.,* 507 F. Supp. 2d 1117, 1123 (D. Haw. 2007); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 928–29 (9th Cir. 2000) (noting that "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance

---

VII claim, but adhering to the required elements of a claim in order to evaluate plausibility under *Iqbal* and *Twombly).*

[7]Dixon also fails to allege that she was qualified for her position and performed her job satisfactorily, the second element of a prima facie case.  While, as noted above, Dixon is not strictly bound by the elements of a prima facie case on a Rule 12 motion, her failure to allege this element is only one of several identified deficiencies.

review and refusal to consider for promotion" constitute adverse employment actions, whereas "declining to hold a job open for an employee and badmouthing an employee outside the job reference context" do not).   That is, Dixon offers no factual details supporting a significant change in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."   *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).   In fact, it is not clear that Dixon alleges an employment action at all.   *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (holding that plaintiffs failed to satisfy third prong of prima facie case because "the fact that the appellants do not receive the same or substantially similar benefits . . . cannot be considered an 'adverse employment action' because the provision of these benefits by the [employer] is not an 'employment action' at all").

"A tangible employment action in most cases inflicts direct economic harm." *Id*. at 762; *see also Kortan*, 217 F.3d at 1113 (no adverse employment action where the plaintiff "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit.").   Here, no such economic harm is alleged to have occurred as a result of the two aforementioned acts.   The allegations fail to rise to the level of tangible harm attributable to the DOE.

Dixon attempts to plead around this deficiency by alleging that she "has suffered financial harm to the extent that she has lost part of her salary, been forced to use her paid time off to make up for the difference between her salary and workers' compensation benefits, and lost earning capacity." SAC ¶ 36. Any alleged economic harm resulting from Dixon's *voluntary* paid administrative leave commencing October 12, 2012 does not constitute an adverse employment act for purposes of Title VII—Dixon does not allege that she was terminated, involuntarily place on leaved by the DOE pending an investigation or discipline, or constructively discharged. *See also Swearnigen–El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 860 (7th Cir. 2010) (affirming summary judgment against plaintiff who was, among other things, placed on paid leave, because the plaintiff failed to establish an adverse employment action); *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 773 (5th Cir. 2009) ("[P]lacing [the employee] on paid leave—whether administrative or sick—was not an adverse employment action.") (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (internal quotation marks omitted)); *Eggers v. Moore*, 257 Fed. Appx. 993, 995 (6th Cir. 2007) ("[P]aid leave is not an adverse employment action.") (citing *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004)); *Thorne v. Merit Sys. Prot. Bd.*, 681 F. App'x 923, 927 (Fed. Cir. 2017); *but cf. Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (en banc) (concluding for purposes of First Amendment *retaliation* claim that, under some circumstances, *being placed*

"on administrative leave pending discipline" can constitute an adverse employment action).   Indeed, Dixon remains employed by the DOE.

As to the fourth element, although Dixon contends that she was treated less favorably than her white, male counterpart, she again fails to provide facts that the two were similarly situated in all material respects.   Employees "are similarly situated when they have similar jobs *and* display similar conduct."   *Vasquez* 349 F.3d at 641.   Here, the SAC is devoid of any *facts* that Dixon and the white male counselor were similarly situated—that they performed materially similar roles, displayed similar conduct or were involved in comparable incidents.   *See Moran*, 447 F.3d at 755 ("the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects"); *cf. Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1163 (C.D. Cal. 2013) ("Courts 'require that the quantity and quality of the comparator's [conduct or] misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'") (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).   Dixon must allege facts, rather than conclusions, regarding employees in similar circumstances to allow a meaningful comparison.   The legal conclusions in the SAC are not sufficient.   *See Iqbal*, 556 U.S. at 678.

Dixon offers no facts that similarly situated employees outside her protected class were treated more favorably *in similar circumstances*.   For example, there are no allegations of similarly situated employees reporting any assaults by a parent, where Reed or other DOE decisionmakers either (1) took no action, or (2) rejected a request to limit contact between the employee and the parent (or related student). Nor does Dixon assert that the DOE accommodated any reassignment request from the white male counselor, regardless of the basis.   Although Dixon need not detail every manner in which she and her white male colleague were materially identical, there is no indication that the two employees had *anything* in common other than their job titles.   That is, there are no facts in the SAC that even attempt to show that the two were similarly situated—that "they have similar jobs *and* display similar conduct."   *Vasquez* 349 F.3d at 641; *see also Mahoe v. Operating Engineers Local Union No. 3 of the Int'l Union of Operating Engineers, AFL-CIO*, 2013 WL 5447261, at *5 (D. Haw. Sept. 27, 2013) (dismissing disparate treatment claim where the complaint "lack[ed] sufficient information to show that the position of Recording Correspondent Secretary," the position of an employee who did not suffer the adverse employment decision suffered by plaintiff, "was similar to [plaintiff's] position of Treasurer"); *Day v. Sears Holdings Corp*., 930 F. Supp. 2d 1146, 1168 (C.D. Cal. 2013) ("[Plaintiff] adduces no evidence regarding other employees accused of impeding an investigation.   Most significantly, she has

proffered no evidence that a similarly situated employee outside her protected class engaged in all three forms of misconduct without being disciplined."); *Meaux v. Nw. Airlines, Inc*., 718 F. Supp. 2d 1081, 1090 (N.D. Cal. 2010), *aff'd*, 490 F. App'x 58 (9th Cir. 2012) (employees were not similarly situated because "Plaintiff's and Doe's conduct [was] not comparable").

Under these circumstances, Dixon has again failed to state a claim for race or sex discrimination based upon disparate treatment under Title VII.

## IV.   **Dixon Fails to State a Retaliation Claim**

Count II alleges that the DOE "retaliated against Plaintiff for bringing complaints of harassment and discrimination which were violations of Federal law." SAC ¶ 54.   Dixon's retaliation claim appears to arise from the events relating to the August 2012 assault by the parent, her subsequent report of the assault to Reed, and Reed's rejection of her request to reassign the student to another counselor.   She alleges that the DOE "forced [her] to continue working in a dangerous situation in retaliation for her opposition to Defendant's discriminatory practices, thereby leaving Plaintiff with no choice but to go out on workers' compensation disability." SAC ¶ 53.   Once again, Dixon fails to state a claim for retaliation under Title VII.

An employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII.   *See* 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer

to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

To maintain a retaliation claim, Dixon must assert (1) that she was engaged in a protected activity opposing an unlawful employment practice; (2) that she suffered an adverse employment action, and (3) that there was a causal link between her activity and the adverse employment action. *Freitag v. Ayers*, 468 F.3d 528, 541(9th Cir. 2006). Plaintiff has failed to meet the requirement that she allege *facts* supporting these elements.

First, Dixon must have engaged in activity protected by the statutes on which she relies. Here, however, Dixon does not specifically allege that she complained about discrimination or harassment *on the basis of* race, color, sex or any other protected category to anybody prior to filing her EEOC Charge on January 13, 2013. *See Nguyen v. McHugh*, 65 F. Supp. 3d 873, 901 (N.D. Cal. 2014) ("A retaliation claim requires that Plaintiff engaged in protected activity and that she was

'subsequently' subjected to an adverse employment action. Plaintiff has not demonstrated that she engaged in protected activity prior to her EEOC complaint.") (citations omitted). Her alleged complaints to Reed from August 2012 through October 12 related to her work duties—she reported an assault by a parent and Reed took no action; she then requested the student be reassigned, but Reed denied her request. None of her complaints to Reed specifically related to her race, color, or sex. Although she alleges that Reed refused to reassign the student to the other counselor because "he does not do well with change," Dixon does not allege that she complained to Reed about any conduct on the part of anyone at the DOE that implicated any protected category. *See, e.g., Lalau v. City & Cty. of Honolulu*, 938 F. Supp. 2d 1000, 1018 (D. Haw. 2013) (noting that the first element of a retaliation claim may not be satisfied by a complaint regarding behavior unrelated to a protected category, and that, "even if [plaintiff's] demotion was retaliatory, the retaliation allegedly related to his intent to report misconduct unrelated to his national origin or his age"). Dixon, in other words, fails to set forth facts permitting the reasonable inference or conclusion that the DOE's alleged retaliation related to her reporting of or opposition to race, color, or sex discrimination.

Even if the Court were to assume that Dixon's temporally distant complaints to Armstrong regarding unspecified "disparate treatment" were sufficient to satisfy the protected activity requirement, Dixon nevertheless fails to allege an adverse

employment action that is "reasonably likely to deter employees from engaging in protected activity." *Vasquez*, 349 F.3d at 646. Dixon's decision to go "on leave due to the harassment and discrimination to which Defendant had subjected her," SAC ¶ 35, is not an adverse employment action in response to any protected activity, based upon the sparse facts alleged. As discussed above with respect to her discrimination claim, because her voluntary paid leave was not disciplinary and she remains employed by the DOE, no reasonable employee would be deterred from engaging in a protected activity. *See, e.g., Russo v. State, Dep't of Mental Health, Retardation & Hosps.*, 87 A.3d 399, 410 (R.I. 2014) ("[P]laintiff's paid administrative leave was not disciplinary, and plaintiff himself testified that he was told that his 'job was safe.' We cannot conclude that a reasonable employee would be deterred from alleging discrimination or engaging in further whistleblowing when there is no threat to his or her continued employment, salary, or benefits.").

Likewise, Reed's failure to take action following the August 2012 incident and her refusal to reassign the student whose parent assaulted Dixon does not constitute an adverse employment action, under the circumstances alleged. *See, e.g.*, *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640–41 (10th Cir. 2012) (holding that employer's failure to investigate an internal complaint of discrimination was not an adverse employment action, where plaintiff argued that employer's "failure to investigate was intended to dissuade her from pursuing the

complaint," but did not "explain how this failure made it more difficult for her to pursue her claims with the EEOC or otherwise assert her rights [and] she does not allege she suffered any other harm from [her employer's] failure to investigate her internal complaint"); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721–22 (2d Cir. 2010) (finding that a failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (failure to reassign or "reassignment of job duties is not automatically actionable," and "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances"); *but cf. Uche-Uwakwe v. Shinseki*, 972 F. Supp. 2d 1159, 1185 (C.D. Cal. 2013) ("Depending on the circumstances, a job transfer can amount to an adverse employment action for purposes of Title VII.") (citations omitted).[8]  Dixon has offered no legal authority to show how denial of this reassignment request was

---

[8]As with the FAC, even if Dixon alleged an adverse employment action, she has not plausibly demonstrated a causal link between any such action and prior protected activity.  As discussed above, she alleges no protected activity other than her EEOC Charge, which was not filed until January 2013.  *See Richards v. City of Seattle*, 342 Fed. Appx. 289 (9th Cir. 2009) (affirming district court's grant of summary judgment and noting the plaintiff could not demonstrate a causal nexus where the adverse employment action took place *before* the protected activity).  All of the retaliatory actions she relies on pre-date the EEOC Charge.

"reasonably likely to deter [a reasonable employee] from engaging in protected activity." *Ray v. Henderson*, 217 F.3d at 1241–43.

For these various reasons, the Court grants the DOE's Motion as to Dixon's retaliation cause of action.

## V.    Dismissal of Dixon's Claims Is With Prejudice

Generally, when a complaint is dismissed, "leave to amend shall be freely given when justice so requires." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010); *see* Fed. R. Civ. P. 15(a).   The Ninth Circuit instructs "that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other *facts*." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (emphasis added) (citations and quotation marks omitted).   Leave to amend may be denied, however, "where the amendment would be futile." *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).

The Court previously gave Dixon notice of the deficiencies in her disparate treatment, hostile work environment, and retaliation claims and provided Dixon with ample guidance and an opportunity to submit an amended complaint.   She failed, however, to cure the deficiencies noted in the Court's 12/5/17 Order. Moreover, she neither adhered to the specific guidance nor heeded the prior warnings provided in the Court's 12/5/17 Order.   The Court specifically explained

that certain claims were dismissed *with prejudice* and cautioned that those claims were *not* to be re-alleged in any amended complaint. The SAC, however, overlooks these admonitions, and alleges the very same Title VII claims against the same Defendant, based largely upon the same discrete acts. Insofar as the SAC simply repeats the same allegations against the same Defendant, it is axiomatic that they fail to state claims—they were all previously dismissed for that reason.

In these circumstances, the Court finds that the SAC's defects cannot be cured; were it otherwise, Dixon in her three previous pleading attempts would have done so. Because the SAC again fails to state a claim for relief, the Court finds that any further attempt to amend would be futile. *See Leadsinger, Inc. v. BMG Music Pub*., 512 F.3d 522, 532 (9th Cir. 2008) (a district court may deny leave to amend for, among other reasons, "repeated failure to cure deficiencies by amendments previously allowed . . . [and] futility of amendment"); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc*., 540 F.3d 1049, 1072 (9th Cir. 2008) (upholding a dismissal with prejudice where, *inter alia*, the deficiencies at issue "persisted in every prior iteration of the [complaint]"); *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 1007 (9th Cir. 2009).

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's Second Motion for Judgment on the Pleadings is GRANTED.   Dkt. No. 62.   The clerk's office is directed to close the case.

IT IS SO ORDERED.

DATED: May 14, 2018 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

*Dixon v. Dep't of Educ.*; Civil No. 16-00110 DKW-KJM; **ORDER GRANTING DEFENDANT STATE OF HAWAII, DEPARTMENT OF EDUCATION'S SECOND MOTION FOR JUDGMENT ON THE PLEADINGS**